[No. 15411.   Department One.   March 22, 1921.]

SUNNY POINT PACKING COMPANY, *Respondent*, v.
ALASKA STEAMSHIP COMPANY, *Appellant*.[1]

SHIPPING (10)—LOSS OF CARGO—LIABILITY FOR SHORT DELIVERY.   A carrier by water is liable for the difference between the quantity of goods received for shipment and that delivered, whether the loss be caused by the freight going overboard in stormy weather or by its being misplaced in unloading the shipment on the dock at point of destination.

Appeal from a judgment of the superior court for King county, Jurey, J., entered April 23, 1919, upon findings in favor of the plaintiff, after a trial before the court without a jury, in an action for loss of goods by a carrier.   Affirmed.

*Bogle, Merritt & Bogle*, for appellant.

*Edwin James Brown* and *John C. Bowen*, for respondent.

FULLERTON, J.—The appellant, Alaska Steamship Company, is a common carrier, engaged in the business of carrying goods by water between Seattle, Washington, and Alaskan ports.   The respondent, Sunny Point Packing Company, is engaged in the business of packing and canning salmon, having a plant for that purpose near Ketchican, Alaska.   On August 18, 1917, the respondent delivered to the appellant's steamship Dolphin, at Ketchican, a quantity of canned salmon for transportation to the city of Seattle.   The salmon was packed in cases, each of like shape and dimensions, and each containing a like number of cans. The cases were taken for loading on the vessel from a warehouse at Ketchican, where it was stored in three separate piles.   Two of these piles were taken in their

¹Reported in 196 Pac. 642.

entirety, and sufficient from the third to load the vessel to its carrying capacity. After loading, the vessel proceeded on its way to Seattle, making no stop until it reached that port.

The vessel on this particular voyage had gone as far north as Skagway. At that point it gathered some freight and gathered more from the different ports it passed on its way from that port to Ketchican, so that, on reaching the latter place, it was partially loaded. A part of this freight was canned salmon packed in cases similar to the cases in which the respondent's salmon was packed. Before the loading of the salmon was commenced from the warehouse mentioned, the mate of the vessel made an estimate of the number of cases the vessel could carry. What this estimate was the record does not show, but it does appear that it was less than the actual number of cases finally taken aboard. As the loading proceeded, he made additional estimates, finally telling the checkers to cease when the number of cases reached thirty-five hundred. The checking was done on behalf of the vessel by its freight clerk, and on behalf of the respondent by its shipping clerk. The cases were piled in the warehouse in tiers of equal height and width, so that the number of cases in the piles loaded could be ascertained by counting the number in a tier and multiplying this number by the number of tiers. It was in this manner that the number of cases in the two piles taken was ascertained.

As to the manner of checking the cases taken from the third pile, the clerks of the respective parties testify to different methods. The clerk of the vessel testifies that, after the cases in the piles the whole of which was taken, the mate of the vessel gave an estimate of the additional number for which the vessel had space, and that this number was counted by checking

off a certain number of tiers from the third pile sufficient to make up the amount of the estimate; that a like method was pursued for the second estimate, and also for the final estimate after the mate had told them to load sufficient to make the total number of cases thirty five hundred.

The clerk of the respondent testifies that the amount of the mate's estimates were counted from the third pile by counting the cases tier by tier as they were taken from the pile. The clerk of the respondent, as the work of loading progressed, kept his count of the number of cases delivered to the vessel on the back of a salmon case. The clerk of the appellant kept his check in the cargo book, which he explained is a list of the cargo that the vessel delivers or receives at the different ports of call on the voyage. Neither of these were produced at the trial. At no time during the loading was there a disagreement between the clerks as to the number of cases taken, and a bill of lading was issued showing the receipt by the vessel of thirty-five hundred cases.

The vessel on its trip south from Skagway seems to have had a somewhat rough voyage. The captain's log shows that the vessel was detained at Moria Sound for several hours "waiting for the wind and sea to moderate"; and the final entry therein is: "Strong S. E. gale & fog on trip south." The wharfinger's cargo receipt given the vessel after the vessel reached Seattle and the cargo discharged, shows that certain of the cases were "wet by water," and that five cases belonging to another of the shipments were wet because having fallen overboard. The record, however, contains nothing tending to show at what period during the voyage the cases of salmon belonging to respondent became wet, nor does it show at what place the other cases mentioned fell overboard.

The vessel, on arriving at Seattle, discharged cargo at three separate docks. At the first, the miscellaneous cargo was discharged; at the second, the respondent's shipment of salmon and the salmon shipment of another consignee was discharged; and at the third, the other consignment of salmon. When the cargo was finally discharged, it was found that the number of cases comprising the respondent's shipment was less by one hundred and fifty-one than the number of cases shown in the bill of lading—a quantity, when measured by weight, slightly in excess of three and one-half tons. No count was made of the number of cases discharged as they were taken over the vessel's side. The shortage was ascertained by counting the cases after they were in piles on the dock at which they were unloaded. The count was made by the same clerk of the appellant who made the count at the place of delivery, no agent or representative of the respondent being then present.

The respondent recovered in the court below for the value of the missing cases. The cause was tried by the court sitting without a jury, and is before us on the question whether the evidence justified the judgment.

Notwithstanding somewhat lengthy briefs have been filed and the arguments of counsel have taken a wide range, we cannot think that the question presented requires extended discussion. Conceding, as the carrier contends, that the burden was upon the shipper to show, apart from the presumption usually accorded a bill of lading, that the number of cases of salmon claimed to have been delivered to it for carriage was actually so delivered, we are of the opinion that the shipper has met that burden. At the place of loading there was nothing to interfere with the accuracy of the count. The cases in the piles actually taken were piled regularly in tiers of the same width and height

and the number therein could be ascertained almost at a glance. Since they were counted both by the vessel's agent and the agent of the shipper, each pursuing his own methods, and since these counts agree, there is little room for supposing that a mistake was made in the number of cases contained therein. That all of the cases contained in these piles were put aboard the vessel, both parties agree. That there was more room for error in the count of the number of cases taken from the third pile may be conceded, but even as to this the chance of error was slight, since each checker kept his own count and there was at no time a disagreement between their respective counts.

On the other hand, there are much stronger reasons for the belief that a loss occurred during the voyage, or at the dock after the vessel reached its destination. The voyage, as the captain's log shows, was somewhat tempestuous. Salmon cases of another shipment, loaded in that part of the vessel in which these cases were loaded, went overboard. No check of the number of cases unloaded was kept as the cases were taken from the vessel. The loss was ascertained by the count after they had been piled upon the dock. While the checker testifies that he kept track of the longshoremen who were performing the work, and was careful to see that none of the cases were misplaced or intermixed with other piles of salmon cases on the dock, it seems to us that the chance of error was here much greater than was the chance of error at the place of shipment. A loss caused by either of the reasons suggested will not excuse a failure to deliver on the part of the carrier. A carrier was at common law an insurer, save as against the act of God or of the public enemy. While by the Harter act its liability has been somewhat more limited, still nothing is here shown to bring the carrier within the excepted causes.

Our conclusion is that the trial court correctly held the carrier liable for the loss. The judgment will stand affirmed.

PARKER, C. J., MACKINTOSH, BRIDGES, and HOLCOMB, JJ., concur.